# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| YARMO GREEN, | ) | |
|---|---|---|
| Petitioner, | ) | |
| | ) | Case No. 08 cv 3250 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| JASON GARNETT[1], | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is petitioner Yarmo Green's Amended Petition for Habeas Corpus Relief [52]. Although it appears that a myriad of issues plagued Green's conviction for attempted murder, none rise to the level of constitutional infirmity and this Court lacks the authority to order a new trial under these circumstances. For the reasons set forth below, the amended petition is denied.

**I.      Background**

*A. Trial and Direct Appeal*

On September 12, 1995, following a bench trial, petitioner Yarmo Green was convicted of attempted first degree murder of Alfonso Briseno, and aggravated battery of Tito Lopez. The trial judge, Hon. Fred Suria, sentenced Green to an extended-term of 40 years in prison for the attempted first degree murder and a concurrent 3-year term for aggravated battery.

On direct appeal, Green argued that the State failed to prove him guilty beyond a reasonable doubt of attempted murder, and that the trial court erred in imposing an extended-term sentence. The Illinois Appellate Court affirmed the conviction by Rule 23 Order. *Illinois v. Green*, No. 1-96-0161 (Ill. App. Ct., 1st Dist. Aug. 18, 1998).

---

[1] During the pendency of this case, petitioner Yarmo Green was released from Lincoln Correctional Center (his last institution of incarceration) and is now serving a term of mandatory supervised release. Therefore, the Court substitutes the current Illinois Chief of Parole, Jason Garnett, as respondent. *See* Fed. R. Civ. P. 25(d).

The following recitation of the facts is derived from the Illinois Appellate Court's Rule 23 Order affirming the denial of the supplemental postconviction petition. *Illinois v. Green*, No. 1-12-3456, 2014 IL App (1st) 123456-U (Mar. 17, 2015). The state court findings are presumed correct, and petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. *Brumfield v. Cain,* 135 S. Ct. 2269, 2282 n.8 (2015). Petitioner presents no evidence to rebut the state court findings.

In the early morning hours of December 26, 1994, Claudia Marchan, Natalie Perez, Tito Lopez, and Alfonso Briseno were moving furniture out of an apartment at 2501 North Washtenaw in Chicago. Briseno remained in the apartment while Marchan, Perez, and Lopez, moved some tables to a van parked in a nearby alley. As they were walking toward the van, Marchan saw a car drive by, stop, reverse, and then block the van in the alley. Green and Green's co-defendants, Juan Cardenas and David Robles, who Perez and Lopez recognized from the neighborhood, got out of the car and walked toward the van. Perez and Lopez testified that Green and Cardenas were members of a rival gang.

Green approached the driver's door of the van. Marchan and Perez hid in the back of the van and Lopez was holding the van door shut as he attempted to start the van. Cardenas opened the sliding door, removed one of the tables and struck Lopez in the face. Cardenas then dragged Lopez into the back of the van where he and Green continued to hit him. Green struck Lopez with his fists, knees and elbows more than 10 times and told Lopez, "[y]ou're going to die, motherfucker. You're coming with us." Cardenas and Robles also struck Lopez. Green attempted to light Lopez's shoes on fire but Lopez was able to kick the lighter out of his hand. Green tried to pull Lopez out of the van but Lopez resisted. Green then told Lopez to get out of the van and fight one of them one-on-one. Lopez said he would fight Robles if they promised to let him go. Lopez testified that he

2

chose Robles because he was closest to his size. Cardenas promised Lopez "on his gang's nation" that if Lopez fought Robles, they would let him go.

Robles got out of the van first. A minute later Cardenas and Green, followed by Lopez and Marchan got out of the van. Marchan and Lopez testified that when they stepped out of the van, they saw Briseno lying face down on the ground, bleeding from the head. He appeared to be unconscious. Green picked Briseno up by the back of his shirt and said, "[o]h, this motherfucker is dead." Then, Green dropped Briseno to the ground and kicked him in the groin. Cardenas also kicked Briseno several times while he was lying on the ground.

Natalie Perez testified that she saw Briseno walking from the apartment toward the van and saw someone strike him on the head. Initially, she was reluctant to state the name of the person who she saw strike Briseno because she had received threats from several gang members. The following day, the State recalled Perez and she testified that she observed Green strike Briseno on the forehead with his hand. She testified that she thought Green had something in his hand when he struck Briseno, but she was uncertain what the object was.

Robles and Lopez were fighting during this time. After the fight ended, Lopez ran away. When Marchan was able to get the van started, Green said, "[y]ou're lucky bitch." The three men then walked to their car and drove away.

When they left, Marchan got out of the van to look for Lopez, but Lopez was gone. She told Briseno to get up but he was nonresponsive. Marchan and Perez put Briseno in the van and drove around the block to look for Lopez. When they were unable to find him, they drove to Perez's house where they called the police. Shortly thereafter, an ambulance arrived and took Briseno to the hospital.

The parties stipulated that Briseno was admitted to the hospital on December 26, 1994, and was immediately taken into surgery for an "evacuation subdural hematoma and drainage" and an

3

"external ventricular drain." Briseno was discharged from the hospital on January 5, 1995, and was transferred to a rehabilitation hospital where he remained until February 16, 1995. Briseno was unable to walk, talk or respond to questions for over a month after the incident.

Green was ultimately convicted of attempted first degree murder and two counts of aggravated battery, one count as to each victim. Green was sentenced to an extended term sentence of 40 years' imprisonment.

*B. Postconviction Proceedings*

Green filed a *pro se* postconviction petition on December 1, 1998, arguing: (1) ineffective assistance of trial counsel for failure to verify the physical condition of the victim, and for failing to raise the sentencing issue in a motion to reconsider sentence; (2) he was prevented from cross-examining a therapist who Briseno's mother made reference to in her testimony; (3) his sentence was excessive; and (4) ineffective assistance of appellate counsel for failure to raise the issue of trial counsel's ineffectiveness. On November 9, 1999, Green supplemented his postconviction petition with a brief. The State filed a timely motion to dismiss Green's petition that was granted by the court after arguments. On January 12, 2007, the Illinois Appellate Court affirmed the dismissal of Green's postconviction petition. *Illinois v. Green*, 369 Ill. App. 3d 1047, 932 N.E. 2d 1220, 342 Ill. Dec. 759 (1st Dist. 2007) (unpublished order under Supreme Court Rule 23).

On February 4, 2009, Green requested leave to file a supplemental postconviction petition in the circuit court. Petitioner attached a May 14, 2008, affidavit of Adelaide Cornell, who testified at trial using the name Natalie Perez. For the sake of clarity, Natalie Perez is referred to as Cornell from this point on.

In her affidavit, Cornell acknowledged that she testified under the assumed name of Natalie Perez at Green's trial and that the police officers knew her real name but allowed her to testify under her assumed name. She stated that Green was innocent and that he was talking to her during the

entire incident. She stated that despite her testimony at trial, she never saw Green hit Briseno. She stated her testimony at trial was false and that the police and prosecution told her to testify against Green rather than Green's co-defendants Robles or Cardenas. She also stated that she had been threatened by the prosecution between the first and second day of trial; that her daughter would be taken away if she did not testify against Green. She further averred that she had been paid "a nominal amount of case money by the prosecution" to testify against Green and after that she testified that she saw Green hit Briseno in the head.

The court denied the State's motion to dismiss, allowed Green leave to file and advanced the supplemental petition for a third stage evidentiary hearing.

At the evidentiary hearing, Cornell stated that she testified at trial under the assumed name of Natalie Perez because she was a ward of the Department of Children and Family Services (DCFS) at the time, had run away and had a baby on November 14, 1994, and the State was looking for her. She was 15-years-old. Cornell stated that Officer Kirschner, one of the officers in the district where she was questioned, knew her real name. Although Officer Kirschner was not involved in the investigation, he "hinted" to Cornell during her questioning that she should pick Green. "Like he didn't like them because they were just a piece of shit because they gang bang a lot, you know." None of the officers actually told her to say that Green did it but told her to just stick with what she had previously told them which was Green hit Briseno with a rock. Cornell testified that what she had told the officers was not true. She stated that she was forced to lie by her friends and the other gang, in addition to being pressured by the police and being afraid that her baby would be taken away.

Cornell explained that she spoke with the prosecutor before she testified at Green's trial. During that conversation, a male prosecutor, whose name she could not remember, told her that she needed to be honest, to remember what happened and to do the right thing or her baby would be

5

taken away by Department of Children and Family Services. Assistant State's Attorney ("ASA") Robert Heilingoetter testified that he prepared Cornell for trial, but did not threaten her, tell her to identify Green, or offer her any money. After she testified at trial, a male police officer told her she did a good job and gave her money. The police officers testified that they did not give her any money. She could not remember who the officer was or how much money he gave her. Marchan and Lopez were present at the time but neither saw the transaction.

On cross-examination, Cornell stated that she, Lopez and Marchan were at that location on the night of the incident to buy drugs, not to move furniture. She stated that her baby's father and Green were both members of the Maniac Latin Disciples but she hung with the Latin Lovers, a rival gang. Her uncles and cousins were members of the Latin Lovers. She was afraid to testify at trial because of the rival gang issue.

She testified that Robles and Cardenas tried to light Lopez's shoes on fire but Lopez escaped and ran. She testified that she did not remember if Green told her "someone is going to die tonight." However, Cornell was impeached with both her grand jury and trial testimony. Cornell also testified that Green, Cardenas and Robles never hit Lopez. She was then impeached with her grand jury and trial testimony. She was also impeached with her grand jury and trial testimony wherein she stated that Green hit Briseno on the head, Briseno fell to the ground, Green picked him up, said he was dead, punched him again and threw him back on the ground. Cornell testified that she did not remember being at the grand jury and did not remember much of the trial because her memory was "totally gone from back then."

Cornell testified that she was present during the entire incident on December 26, 1994, and never saw Green strike Briseno. She stated that she never saw Briseno come out of the building, and never saw him come into the alley that day. She found Briseno unconscious inside the apartment building by the fireplace. She did not know why he was unconscious but said he had been drinking

and doing drugs earlier in the evening. She further testified that Green never picked Briseno up off the ground, never said "this bitch is dead" and never dropped him back to the ground. Instead, she stated that she and Green had a conversation and smoked cigarettes next to the van while Lopez was being attacked by Robles and Cardenas.

With respect to her affidavit, Cornell testified that Attorney James Zeas wrote the affidavit and she reviewed it before signing it. She acknowledged that her affidavit stated that the prosecutor paid her to testify. She stated that this was wrong. It was a police officer who paid her, not the prosecutor. Cornell acknowledged that at the time of the hearing she was in custody and had prior convictions for aggravated battery, attempt aggravated arson, aggravated battery to a police officer, misuse of a credit card and theft and possession of stolen property.

Green testified on his own behalf at the evidentiary hearing and stated that he was asserting his actual innocence regarding his attempted murder conviction only. Green stated that on the night in question he and Cornell were having a conversation in the alley near the van. He thought Cornell was pregnant by one of his friends and did not think that she should be out there with a gang war going on. While he was talking with Cornell, he heard a thud and when he turned around, he saw a body on the ground, face down. Green knelt down and turned the body over and saw that it was Briseno. He had not seen Briseno before then. He denied hitting or kicking Briseno. He also denied that he spoke with Robles or Cardenas about getting into a fight with Briseno and stated that he did not have a weapon.

Green explained that he, Robles and Cardenas, went into the alley that night because they saw Lopez spray painting disrespectful things about their gang, the Maniac Latin Disciples, on the walls. He and his friends went into the alley to confront Lopez. Green stated that he hit Lopez repeatedly but did not try to light his shoes on fire.

7

After hearing the testimony of Cornell, Green, Officer Kirschner, Detective Crespo, ASA Mark Shlifka and ASA Heilingoetter, the court denied Green postconviction relief. The court found that Cornell's testimony suffered from various inconsistencies and found her to be incredible. The court went on to state that even if Cornell were credible her testimony "would fall far from completely exonerating" Green. The trial court stated that even if Green never hit the victim, as alleged by Cornell, Green would still be guilty of the crime of attempted first degree murder under a theory of accountability based on Cardenas' actions. The trial court also found that Cornell's recantation failed to explain Green's remorseful statement at sentencing, where he apologized to Briseno's family and stated "I made the biggest mistake anyone can ever make." The court also rejected Green's claim that the state violated *Brady* by failing to disclose the use of false testimony and its role in procuring that testimony by threatening Cornell and paying her for false testimony. Finally, the court dismissed Green's claim that the State violated his due process rights by knowingly using Cornell's perjured testimony at trial.

On collateral appeal, Green argued that the trial court erred in: (1) finding that an eyewitness's recantation testimony was not sufficient to support a claim of actual innocence; (2) denying his claim under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); and (3) denying his due process claim. The Illinois Appellate Court held that the trial court did not err in denying Green postconviction relief following a third-stage evidentiary hearing on his supplemental postconviction petition. *Illinois v. Green*, No. 1-12-3456, 2014 IL App (1st) 123456-U (Mar. 17, 2015).

## II.   Petitioner's Claims

*A. The AEDPA Standard*

Petitioner must demonstrate that he is in custody in violation of the Constitution, laws, or treaties of the United States before a writ of habeas corpus will issue. 28 U.S.C. § 2254(a). Because the state courts adjudicated Green's claims on the merits, the Court's review of the present habeas

8

corpus petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or the state court decision is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d).

"'A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts.'" *Premo v. Moore*, 562 U.S. 115, 128 (2011) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). "An 'unreasonable application' occurs when a state court 'identifies the correct legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of Petitioner's case.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Williams v. Taylor*, 529 U.S. 362, 413 (2000) (opinion of O'Connor, J.)).

Clearly established federal law is the "'holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams*, 529 U.S. at 412). The state court is not required to cite to, or even be aware of, the controlling Supreme Court standard, as long as the state court does not contradict the Supreme Court standard. *Early v. Packer*, 537 U.S. 3, 8 (2002). The Court begins with a presumption that state courts both know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citations omitted). This presumption is especially strong when the state court is considering well established legal principles that have been routinely applied in criminal cases for many years. *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).

The Court's analysis is "backward looking." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). The Court is limited to reviewing the record before the state court at the time that court made its

decision. *Id.* The Court is also limited in considering the Supreme Court's "precedents as of 'the time the state court renders its decision.'" *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011) (quoting *Cullen*, 562 U.S. at 182; *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)) (emphasis omitted).

"The AEDPA's standard is intentionally 'difficult for Petitioner to meet.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 134 S. Ct. 1702 (2014); *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013)). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This "'highly deferential standard [ ] demands that state-court decisions be given the benefit of the doubt.'" *Cullen*, 563 U.S. at 181 (quoting *Woodford*, 537 U.S. at 24). In his Amended Habeas Corpus Petition, Green cites seven grounds for relief.

　　*B. Perjured Eye-Witness Testimony*

Green argues that both the postconviction trial court and the appellate court were objectively unreasonable in finding that Cornell's postconviction hearing testimony was not credible because of her criminal history. Green asserts that Cornell's testimony was credible and as the sole evidence linking Green to Briseno's injury her credible recantation means that the postconviction courts based their decisions on an unreasonable determination of the facts.

The Illinois Appellate Court affirmed denial of Green's postconviction petition, including the trial court's assessment of Cornell's credibility. *See Illinois v. Green,* 2014 IL App (1st) 123456-U, *P35, 2015 Ill. App. Unpub. LEXIS 507 (1st Dist. 2015). While the Illinois court did not explicitly cite the *Napue v. Illinois,* 360 U.S. 264, 269-70 (1959), for the standard regarding false testimony, it affirmed the trial court's finding that there was no evidence to suggest that Cornell's testimony was perjured.

10

The state court considered Cornell's testimony in the context of an eyewitness recanting their testimony and an actual innocence claim. *Id.* at *P32. In so doing, the court noted that "recantation evidence is generally considered unreliable[.]" *Id.* at *P33 (citing *Illinois v. Dobley,* 341 Ill. App. 3d 621, 632, 793 N.E.2d 189, 275 Ill. Dec. 709 (1st Dist. 2003). The court recounted the trial court's finding that Cornell's testimony was inconsistent. The court found direct contradictions between Cornell's testimony and Green's admission that he hit Lopez, which was corroborated by Marchan, Lopez, and Cornell's grand jury and trial testimony. Further, the court noted Cornell's testimony contradicted the sequence of events that multiple witnesses testified to at trial. Cornell's testimony that Briseno was never lying on the ground in the alley, but that she found him in the apartment, was also in conflict with other witness testimony. In addition to these inconsistencies the court found her recanted testimony incredible based on her criminal background. *Id.* at *P34.

On federal habeas review, this Court presumes that the state court's credibility determinations are correct, unless the petitioner rebuts those findings with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Woolley v. Rednour*, 702 F.3d 411, 426–27 (7th Cir. 2012). Green has not presented such evidence. He argues that the state court should not have found the testimony inconsistent and Green harmonizes Cornell's new version of events to try to demonstrate that consistency. Green also disputes the state court's characterization that Lopez was beaten as opposed to hit with an open hand. However, these arguments are not enough to rebut the presumption that the Illinois courts' determinations of credibility are correct. This Court cannot find on this basis that the state court's application of the law was unreasonable.

*C. Brady Violation*

Green claims that he was deprived of his constitutional right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963), when the State failed to disclose material, exculpatory evidence in the

11

form of Cornell's false testimony, which, if disclosed, would have had a reasonable probability of changing the outcome at trial.

The Illinois Appellate Court set forth the standard that to prove denial of due process under *Brady*, "a defendant must show that: (1) the evidence is favorable because it is exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence was material to guilt or punishment." *Green,* 2014 IL App (1st) 123456-U, at *P37 (citing *Illinois v. Beaman,* 229 Ill. 2d 56, 73-74, 890 N.E. 2d 500, 321 Ill. Dec. 778 (2008) (applying *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)). The Illinois Appellate Court then reviewed the trial court's finding that there was no *Brady* violation and recounted the basis for that ruling. The court found that Cornell's allegations regarding coercion and payment by a prosecutor or a police officer suffered from various inconsistencies. In her affidavit she stated that an Assistant State's Attorney threatened to take her baby away if she did not testify against Green and that they offered her money in exchange for the testimony, but Cornell's testimony at the hearing was not that a prosecutor threatened her or promised to pay her money. Instead, she said it was Officer Kishner who "hinted" that that she should identify Green and that an officer paid her after trial. *Id.* at P*39. The court also considered that the state denied all of these allegations. Moreover, the court found the evidence showed Cornell's fear stemmed from being caught between two rival gangs and not from the police or the prosecution. *Id.* at *P40. Cornell also testified at the grand jury that she was not promised anything and was not threated in exchange for her testimony.

Although Green argues that Cornell's testimony that a police officer paid her after trial was not contradicted by any witness, it was also not corroborated by any witness and Marchan and Lopez supposedly were present during that exchange. Green also argues that it was unreasonable for the state court to determine Cornell's credibility based on her inability to remember certain details.

12

However, that credibility determination was made in light of other evidence. *See id.* at *P38. As this Court noted above, state court determinations of credibility are presumed correct unless there is clear and convincing evidence to rebut the presumption. Green fails to raise sufficient evidence to meet that standard. This Court finds that the Illinois Appellate Court's rejection of this claim was not an unreasonable application of *Brady*.

  *D. Perjured Testimony from Victim's Mother*

  Green claims that his due process right to a fair trial under the Fifth and Fourteenth Amendments was violated when Anna Marcial lied about her son's medical condition. The nature and extent of Briseno's injuries were described at trial only by his mother. She testified that her son was nearly totally incapacitated as a result of the head injury sustained in this incident and denied that he suffered any injuries subsequent to the one at issue and prior trial. She further testified that Briseno was unable to dress or bathe himself for 4-5 months after this incident. When asked directly if Briseno had been injured after the December 1994 incident, Marcial testified that Briseno had not had any recent injuries. As of the date of her testimony, September 12, 1995, Briseno was unable to go to school and Marcial did not know when he would be able to return. She testified that he could be in therapy for 3 years.

  Green asserts that Briseno's medical records contradict Marcial's testimony about her son's condition. The medical records indicate that as of March 9, 1995, less than three months after the incident, Briseno was walking and talking and had been doing progressively better.[2] On March 30, 1995, he was injured in another altercation (unrelated to the December 1994 incident involving Green), during which he sustained head trauma from a beating. The hospital admission record for the March 30, 1995, incident notes: "Head injury in December '94… he was doing well following that injury until last night when he was hit over the head multiple times." The discharge note from

---

[2] Briseno's medical records were admitted via a stipulation but there was no testimony other than Marcial's regarding Briseno's condition.

13

his physical therapy dated April 4, 1995, states: "… head injury December 94 requiring craniotomy. Progressing well until 3-30-95 when he was assaulted/hit multiple times." The notes from a follow-up visit state: "On 3-30-95 again beaten by rival gang members… mom concerned about behavior outbursts, aggression."

Green argues that his due process rights were violated by Marcial's perjured testimony and his trial counsel's failure to cross-examine Marcial, leading to a lack of distinction made between injuries sustained in the incident at issue in December 1994 and the March 1995 altercation. The State never corrected the false testimony from Marcial in violation of *Giglio*. The trial court relied heavily on Marcial's testimony to find Green guilty and sentence him to an extended term based on the "brutal and heinous" nature of the attack. Green asserts that there is a reasonable likelihood that the false testimony affected the outcome of the trial and sentencing since Marcial was the only witness to testify about the injuries allegedly suffered by Briseno. The subsequent decision by the Illinois Appellate Court to uphold dismissal of his postconviction petition therefore was contrary to or an unreasonable application of federal law according to Green.

This Court disagrees. The Illinois Appellate Court stated the appropriate standard governing false testimony. *See* Dkt. 53-11, Ex. H at C:00040, *Illinois v. Green,* No. 1-04-1552 (Rule 23 Order January 12, 2007). The court then reasoned that even if Green's assertions regarding Briseno's medical records were true, it does not necessarily amount to perjury when the other evidence demonstrating the severity of Briseno's injuries was overwhelming. *Id.* at C:00041. Even now Green does not dispute that Briseno was taken to hospital where he remained for 11 days, underwent multiple surgeries to treat his head injuries, was transferred to the Rehabilitation Institute of Chicago where he stayed for six weeks. Two to three months of extensive care, to which Green stipulated, does not demonstrate that Marcial's testimony was false. While there are issues that could have challenged some of Marcial's testimony, even without such cross-examination the trial court could

14

still have found Briseno's injuries severe. Thus, this Court finds, as did the Illinois Appellate Court, that even if Marcial exaggerated the length of time her son needed her round-the-clock care, there is not a reasonable likelihood that the outcome of the trial would have been different. *See Tayborn v. Scott,* 251 F.3d 1125, 1131 (7th Cir. 2001) (the petitioner could not demonstrate a reasonable likelihood of a different result at trial based on recanted testimony where there was other evidence of guilt).

   *E. Ineffective Assistance of Trial Counsel*

   Green argues that he was denied his right to assistance of counsel under the Sixth Amendment when his trial counsel did not subject the State's case to meaningful adversarial testing when he failed to investigate, failed to cross-examine Anna Marcial, read discovery materials, or present vital evidence. Green urges this Court to presume prejudice under *United States v. Cronic,* 466 U.S. 648 (1984), or find counsel was otherwise ineffective under *Strickland v. Washington,* 466 U.S. 668, 687, 80 L. Ed. 2d 668, 693, 104 S. Ct. 2052, 2064 (1984).

   Green's trial counsel suffered from mental illness and an addiction to cocaine.[3] The ARDC in its disciplinary opinion found counsel to be "severely dysfunctional" and "incapable of independent functioning in a professional capacity." Green argues that his trial counsel completely failed to subject the prosecution's case to meaningful adversarial testing by failing to present any evidence on Green's behalf, failing to investigate the State's case, failing to cross-examine Marcial, failing to read discovery materials, or present vital evidence. Green asserts that Illinois Appellate Court's decision denying Green's ineffective assistance of counsel claim was contrary to or an unreasonable application of clearly established federal law.

   This Court finds that the state court's rejection of Green's claim based on *Cronic* was not an unreasonable application of the law. As the Illinois Appellate Court noted, *Cronic*'s presumption of

---

[3] Trial counsel, Matthew Jasniewski, was admitted to practice law on October 5, 1993, just short of two years before the trial. He was suspended on February 1, 1999, until further order of the court (and remains so to-this-day).

15

ineffective assistance based on counsel's drug use applies only where there is a total denial of counsel, meaning that the prosecution's case was not subject to meaningful adversarial testing. *See* Dkt. 53-11, Ex. H at C:00037. The court analogized *Illinois v. Bernardo*, 171 Ill. App. 3d 652, 660, 525 N.E.2d 857, 121 Ill. Dec. 550 (1st Dist. 1988), in which the defendant's trial counsel had been disciplined by the ARDC for behavior and mental problems. In *Bernardo*, the court found that prejudice could not be presumed. *Bernardo*, 171 Ill. App. 3d at 660. Similarly, here, the Illinois Appellate Court was not unreasonable in its finding that *Cronic* does not apply and that Green had to demonstrate that he was prejudiced by counsel's failures, which he could not do in light of the totality of the evidence against him. While Green's trial counsel was suspended from the practice of law four years after representing him, this Court finds it would be too speculative to presume that counsel suffered from these issues during Green's trial. It is not as though Green's trial counsel did not do anything to represent Green. True, he did not challenge certain testimony or present certain evidence, which in hindsight appears ill advised or poor strategy. However, as the Illinois Appellate Court discussed at length, the evidence presented and stipulated to demonstrating the severity of Briseno's injuries as well as the testimony at trial from several witnesses who saw Briseno lying face down on the pavement and bleeding from the head suggests that the outcome of the trial would not be different. Based on this evidence, the state court's conclusion that Green had not met the *Strickland* standard because there was no reasonable probability that the outcome of the trial or the length of the sentence would have been different was a reasonable application of the law.

  *F. Apprendi Violation*

  Green claims that under *Teague v. Lane,* 489 U.S. 288, 311-13 (1989), *Apprendi v. New Jersey,* 530 U.S. 466 (2000), should apply retroactively to the trial court's finding that the attempt murder was "brutal and heinous," mandating that it be proved beyond a reasonable doubt. However, this

16

claim is without merit since the Seventh Circuit held that *Apprendi* is not retroactive in *Curtis v. United States,* 294 F.3d 841, 844 (7th Cir. 2002).

*G. Ineffective Assistance of Appellate Counsel*

Green claims his right to effective assistance of appellate counsel was violated when his appellate counsel failed to thoroughly read the trial record, discover Briseno's medical records, failing to challenge trial counsel's effectiveness on direct review, and failing to raise the due process violation. The Illinois Appellate Court considered this claim in Green's first postconviction appeal. That court rejected it and this Court does not find that decision was contrary to federal law or an unreasonable application of the law.

The Illinois Appellate Court applied the two-prong standard of *Strickland*, where a defendant must show both that his counsel's performance was deficient and that he was prejudiced by those errors. *See* Dkt. 53-11, Ex. H at C:00041-42 (citing *Strickland v. Washington,* 466 U.S. 668, 687, 80 L. Ed. 2d 668, 693, 104 S. Ct. 2052, 2064 (1984)). The court also noted that if a defendant fails to prove the prejudice prong, then the reviewing court need not determine whether counsel's performance was deficient. *Id.* at C:00041. Although the court cited to authority from the Illinois Appellate Court for this proposition, it is equally valid under federal law. *See Strickland*, 466 U.S. at 697 ("a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant"); *Groves v. United States*, 755 F.3d 588, 591 (7th Cir. 2014) (If petitioner "is unable to make a sufficient showing of one of the *Strickland* prongs, we need not consider the other."). "A petitioner demonstrates the requisite prejudice only when appellate counsel fails to raise an issue that may have resulted in a reversal of the conviction, or an order for a new trial." *Winters v. Miller*, 274 F.3d 1161, 1167 (7th Cir. 2001).

First, the Illinois Appellate Court reasoned that because it found that Green's claims with regard to the assistance of his trial counsel did not affect the outcome of the trial or sentencing it

17

must also find that appellate counsel's failure to raise ineffective assistance of trial counsel on direct appeal resulted in any prejudice to Green. Dkt. 53-11, Ex. H at C:00042. The appellate court then found that appellate counsel was not required to raise every possible issue and that a review of the issues that were raised led the court to conclude that appellate counsel's arguments were reasonable. Lastly, the court found that counsel's failure to focus on Briseno's medical records did not result in prejudice because other evidence supported the finding that Briseno's injuries were severe. *Id.*

This Court understands Green's frustration regarding the medical records and Briseno's apparent head injury three months after the incident in question here. However, it has never been contested that following the incident in question Briseno spent eleven days in the hospital, underwent multiple surgeries to address his head injuries from this incident, and then spent an addition six weeks in the Rehabilitation Institute of Chicago before going home to his mother's care. This Court is unable to say that the inclusion of arguments regarding Briseno's injury and medical records would have resulted in reversal of the conviction or an order for a new trial. "Genuinely strategic decisions that were 'arguably appropriate at the time, but, with the benefit of 'hindsight', appear[] less than brilliant' will not be second-guessed." *Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir. 1996) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985)). Further, this Court does not find that the Illinois Appellate Court's application of law was unreasonable in the context of the entire record. This Court's "review of an attorney's performance is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Yu Tian Li v. United States*, 648 F.3d 524, 527-28 (7th Cir. 2011).

*H. Actual Innocence*

Although Green initially claimed that he is actually innocent of the crime for which he was convicted, he seems to have abandoned a standalone claim of actual innocence. However, an actual innocence claim serves as a gateway to the consideration of claims on habeas review that would

otherwise be procedurally defaulted. *House v. Bell*, 547 U.S. 518, 522, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). As a general matter, federal habeas courts are precluded from considering habeas claims that were procedurally defaulted because they were not presented for one complete round of state court review. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

Here, the government asserts that three of Green's claims are procedurally defaulted: State's introduction of Marcial's allegedly false testimony; ineffective assistance of trial counsel under *Cronic*; a retroactive *Apprendi* violation; and ineffective assistance of appellate counsel for the failure to argue Marcial's perjury. These arguments were not raised in Green's first post-conviction petition, though they were raised on appeal. The Illinois Appellate Court addressed these claims on the merits and thus they have been fairly presented to the state courts, except appellate counsel's failure to argue Marcial's false testimony. *Malone v. Walls*, 538 F.3d 744, 756 (7th Cir. 2008) ("when it is clear from the state court's decision that it not only recognizes the petitioner's federal claim, but also resolves the claim on the merits, engaging in our typical assessment is unnecessary"). Nevertheless, Green's claim of actual innocence fails.

"[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"*McQuiggin v. Perkins,* ——U.S. ——, 133 S.Ct. 1924, 1928, 185 L.Ed.2d 1019 (2013) (quoting *Schlup,* 513 U.S. at 329, 115 S.Ct. 851). The new evidence must be reliable and may include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *House,* 547 U.S. at 537, 126 S.Ct. 2064 (quoting *Schlup,* 513 U.S. at 324, 115 S.Ct. 851). When deciding the ultimate question of innocence, "the habeas court must consider all the evidence, old and new, incriminating and exculpatory" and then "make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.*

This Court finds that Green cannot meet this exacting standard based on Cornell's recantation and new testimony. The Illinois Appellate Court affirmed the postconviction trial court's finding that Cornell's new testimony was not credible. In light of Green's own admissions, the inconsistencies in Cornell's testimony and the stipulation establishing the extensive medical care that Briseno required before the alleged second altercation three months after the one at issue here, this Court cannot find that no jury would have found Green guilty beyond a reasonable doubt. *See Araujo v. Chandler*, 435 F.3d 678, 681-82 (7th Cir. 2005)(Habeas petitioner made insufficient showing to raise inference of actual innocence based on testimony at postconviction hearing by witnesses whose recantation of their trial testimony was found incredible by state judge).

**Conclusion**

Although there are some issues regarding Green's experience with the justice system from trial through two rounds of postconviction review, this Court finds no constitutional deficiency. Lastly, this Court declines to issue a Certificate of Appealability. Green has not made the requisite substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c). After giving this matter every consideration, this Court denies Green's Amended Habeas Corpus Petition [52].

IT IS SO ORDERED.

Date: September 11, 2017

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge